# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| DIANA K. HOYD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:10-cv-1625-TWP-TAB |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Diana K. Hoyd ("Ms. Hoyd"), requests judicial review of the decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), denying in part Ms. Hoyd's application for supplemental security income ("SSI") and disability insurance benefits ("DIB"). For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND

Ms. Hoyd was born in 1953 and was 49 years old at the time of her alleged onset date of December 4, 2004. She graduated from high school, briefly attended college, and has previously worked as a cashier, supervisor, hand packager, restaurant cook, short order cook, and stock clerk. (R. at 464-67.) Ms. Hoyd testified that she stopped working on December 4, 2004, due to pain in her neck, back, and right hand. (R. at 432.) Specifically, Ms. Hoyd alleges problems with degenerative disc disease of the cervical and lumbar spine, status post carpal tunnel surgery, possible left anterior cruciate ligament and medial collateral ligament tear, and obesity. (R. at 42.) Ms. Hoyd used to live with her husband, but they are now separated. (R. at 458.)

A.  PROCEDURAL HISTORY

On July 20, 2005, Ms. Hoyd filed an application for SSI and DIB, alleging she became disabled on December 4, 2004. Her application was denied initially and upon reconsideration. On August 27, 2008, Ms. Hoyd appeared in Indianapolis, Indiana with an attorney for a hearing before Administrative Law Judge Andrew F. Tanovich ("the ALJ"). On November 6, 2008, the ALJ issued a decision partially awarding and partially denying benefits to Ms. Hoyd. Specifically, the ALJ found that Ms. Hoyd was disabled from December 4, 2004 through February 14, 2006. But, as of February 15, 2006, Ms. Hoyd's condition had improved to the point where she could perform light work activity that did not require frequent or repetitive use of her left hand; did not require climbing, crawling, or balancing; and did not require working around vibrations or work hazards. Accordingly, Ms. Hoyd was not entitled to benefits as of that date. On October 25, 2010, the Appeals Council upheld the ALJ's decision by denying Ms. Hoyd's request for review. The ALJ's decision is therefore the final decision of the Commissioner for purposes of judicial review. This action ensued.[1]

B.  MEDICAL HISTORY

On August 18, 2004, Dr. Terry Litty ("Dr. Litty") ordered x-rays of Ms. Hoyd, which revealed osteophyte formation and degenerative disc disease of the cervical spine. (R. at 190.) On March 5, 2005, Ms. Hoyd complained to Dr. Kumil Mohan ("Dr. Mohan"), a neurologist, of worsening neck pain over a period of four months. (R. at 412.) Dr. Mohan's motor examination revealed that "[p]ower in both upper and lower extremities is 5/5 [and] [t]here is no incoordination on finger-to-nose testing." (R. at 414.) A cervical spine MRI was taken, which showed, among other things, a large central disc extrusion at C6-7, herniations at C3-4 and C5-6,

---

[1] Notably, Ms. Hoyd represents that on November 18, 2010, she filed a subsequent application for SSI and was awarded benefits upon her initial application.

and herniation at C4-5 with probable impingement of the exiting left C5 nerve root. (R. at 416.) On March 14, 2005, Dr. Mohan diagnosed Ms. Hoyd with persistent neck pain, possible C5-6 radiculopathy, possible myfascial pain, facet joint pain, carpal tunnel syndrome based on EMG, chronic diabetes mellitus, hypertension, and obesity. (R. at 409.) Dr. Mohan noted that Ms. Hoyd's pain was a four to five out of ten and that activity exacerbated the pain. *Id*.

On April 13, 2005, one of Ms. Hoyd's doctors, Dr. Eric Potts, completed a medical statement finding that she continues to be totally disabled until May 25, 2005. (R. at 173.) Ms. Hoyd attended physical therapy sessions for her neck and back pain in April and May 2005. (R. at 367-83.) On September 19, 2005, Ms. Hoyd was sent to a consultative examination with Dr. Eyas Youssef ("Dr. Youssef"), administered through the Social Security Administration. (R. at 360.) There, Dr. Youssef noted that her gait was slow but she did not need an assistive device. (R. at 362.) She was able to walk on her heels, toes, and perform tandem walking with minimal difficulty; moreover, she could squat down completely, but her back pain intensified upon standing up. *Id*. Dr. Youssef noted that she did have limitation of movement in the lumbar spine, but all other joints had a full range of motion. *Id*. Additionally, her muscle strength was 5/5 in upper and lower extremities, her right handgrip strength was 4+/5, her left handgrip strength was 4/5, and she was able to button, zip, and pick up coins. *Id*. At this time, Ms. Hoyd alleged that she could not do fine finger manipulation on a repetitive basis. *Id*. On the "impressions" section of his report, Dr. Youssef noted that she had chronic neck pain with surgery scheduled in October 2005, back pain, carpal tunnel syndrome, depression, and hypertension. *Id*.

On October 14, 2005, Ms. Hoyd underwent an anterior cervical discectomy at C6-7 for cervical spondylosis at C6-7 with neck pain and central disk bulge. (R. at 299.) On October 19,

3

2005, a Psychiatric Review Technique form was completed that found no medically determinable impairment. (R. at 324.) On December 15, 2005, Ms. Hoyd stated that she had been suffering intermittent left knee pain and swelling for two weeks with difficulty walking at times, pain in her left elbow, and back cramping since October. (R. at 289.) Notably, in December 2005, a state agency physician reviewed the evidence and opined that Ms. Hoyd could perform a range of light exertion work, and this opinion was affirmed by another agency physician in June 2006 (R. at 339-45).

As of January 24, 2006, Ms. Hoyd was still complaining of low back pain and paresthesias, so a lumbar MRI was ordered. (R. at 86.) On February 1, 2006, doctors noted that Ms. Hoyd is a 50 year old female status post C6-7 ACDF with persistent pain between scapulae, and that Ms. Hoyd states it feels more like spasm than anything else. *Id*. The report noted that she is "mildly tender to the cervical paraspinal muscles." *Id*. The radiology report based on x-rays indicated no interval change in comparison to the previous study of October 15, 2005. *Id*. Stable degenerative changes were seen at C5-6 consisting of disc space narrowing, there was no acute fracture or dislocation, and alignment was normal. *Id*. On February 13, 2006, Ms. Hoyd underwent a lumbar MRI, which revealed mild diffuse disc bulges with no central canal stenosis, mild bilateral neural foramina stenosis at L4-L5, moderate bilateral neural foramina at L5-S1, and degenerative endplate changes at L5-S1. (R. at 87.) A new lumbar MRI, dated April 24, 2006, showed "no significant change from recent prior examination." (R. at 89.)

On May 2, 2006, Ms. Hoyd attended a consultative examination administered through the Social Security Administration. (R. at 278.) According to the examining physician, Dr. Elpidio Feliciano, Ms. Hoyd was cooperative, alert, and did not exhibit acute distress. *Id*. She was positive for arthralgias of the cervical and lumbar spine with radiculopathy. *Id*. Her gait was slow

and antalgic and she could not walk on heels, toes, tandem walk, or squat. *Id*. Her range of motion was diminished in the lumbar and cervical spine. (R. at 279.) Straight leg raising was negative bilaterally, her grip strength was 3/5 on the right hand and 5/5 on the left, and she had the ability to button, zip, and pick up coins with both hands. *Id*.

On October 16, 2006, a Physical Residual Functional Capacity ("RFC") assessment was completed for Ms. Hoyd. (R. at 338.) The doctor opined that Ms. Hoyd was capable of occasionally lifting and/or carrying 20 pounds and frequently lifting and/or carrying 10 pounds. (R. at 339.) She could sit, stand and/or walk a total of 6 hours in an 8-hour workday. *Id*. She had unlimited ability to push and/or pull. *Id*. Further, no postural, manipulative, visual, communicative, or environmental limitations were assigned. (R. at 340-42.)

On October 25, 2006, Ms. Hoyd had an MRI of her left knee taken due to possible meniscal tear. (R. at 91.) The MRI indicated significant findings of a vertical tear passing through the posterior horn and body of the medial meniscus. *Id*. On November 15, 2006, doctors noted that Ms. Hoyd has persistent neck pain and spasm that extends to the low back from cervical spondylosis, and opined that it will not improve with surgery. (R. at 92.) Additionally, an MRI of the lumbar spine was unremarkable. *Id*. She also stated that her balance is off, and that she has memory loss, headaches, ringing in her ears, and difficulty sleeping. (R. at 160.)

On January 3, 2007, Ms. Hoyd arranged to have a consultation for pain management suggestions. (R. at 93.) A March 28, 2007 lumbar x-ray showed degenerative disc disease and facet joint degenerative change, greatest at L5-S1. (R. at 94.) As of July 17, 2007, Ms. Hoyd still suffered back pain. (R. at 95.) Throughout the summer of 2007, Ms. Hoyd suffered problems with menorrhagia, post-menopausal bleeding, and UTIs. (R. at 95-99.) On August 27, 2007, Ms. Hoyd reported that she was suffering from some edema. (R. at 99.)

On September 5, 2007, Dr. Ziad Jaradat ("Dr. Jaradat ") examined Ms. Hoyd during a consultative examination administered through the Social Security Administration. (R. at 254.) Dr. Jaradat observed that "[i]n general the claimant is a well-developed adult in no apparent distress. Alert and cooperative during the course of examination with no perceived exertional dyspnea or difficulty getting out of a chair or on and off the examination table." (R. at 255.) Ms. Hoyd reported using alcohol and smoking one pack of cigarettes per day for 33 years. *Id.* She was observed to have a slow and unsteady gait requiring the use of a cane, and she was unable to walk on heels, walk on toes, tandem walk, or squat. (R. at 256.) She had full range of motion in all joints except cervical, lumbar, and knees. *Id.* Her muscle strength was 5/5 in the upper and lower extremities, her grip strength was 4/5 in both hands, and she was able to button, zip, and pick up a coin. *Id.* Dr. Jaradat concluded that Ms. Hoyd has pain and decreased range of motion in her neck and back, degenerative joint disease, cervical disc disease, hypertension, depression, and carpal tunnel syndrome. *Id.*

On September 20, 2007, Ms. Hoyd attended a psychological evaluation administered through the Social Security Administration. (R at 257.) She cried constantly throughout the interview, had prolonged silences, and had difficulty maintaining composure and continuing the interview. (R. at 259.) Her speech was delayed at times, her eye contact was poor, and her memory was poor. *Id.* She demonstrated pain behaviors consisting of slumped posture, constant wincing, and shifting in her chair. *Id.* The doctor noted that her attention, concentration, and judgment appeared adequate, yet she had to be redirected multiple times to answer questions. *Id.* The doctor gave Ms. Hoyd the diagnoses of adjustment disorder with mixed anxiety and depressed mood symptoms, ruled out depressive disorder, and assigned a GAF of 50. *Id.* She performed inadequately on the mental status evaluation, mostly in the areas of attention,

concentration, and memory, and it appeared as if she was on too much pain medication during evaluation and sedated from her pain medication. *Id*. However, the report also noted that "it does not appear as her psychological factors are significantly and adversely affecting her ability to maintain gainful employment." On October 21, 2007, a Psychiatric Review Technique was completed regarding Ms. Hoyd, which determined that she has no severe impairments and only mild degrees of functional limitation. (R. 238, 248.) The reviewer noted that Ms. Hoyd had been assigned a GAF of 50 but was diagnosed with only an adjustment disorder. (R. at 250.)

On November 19, 2007, Ms. Hoyd continued to complain of back pain. (R. at 101.) On November 30, 2007, Ms. Hoyd underwent a total hysterectomy and was discharged on December 2, 2007. (R. at 102.) On December 4, 2007, Ms. Hoyd saw the doctor for a partial small bowel obstruction. (R. at 106.) Pelvic and abdominal CTs showed diffuse mild enlargement of the intestinal tract indicating post operative ileus versus partial small bowel obstruction, possible cholecystitis, and abnormal multilevel sclerosis in the thoracic lumbar spine of uncertain etiology. (R. at 107.) Ms. Hoyd needed to be readmitted for two days to repair the ileus. (R. at 109.)

On March 5, 2008, Dr. Litty, Ms. Hoyd's treating physician, completed a Medical Assessment of Ability to Do Work-Related Activities form. (R. at 81.) As noted in this form, Ms. Hoyd's ability to lift and carry are affected by her impairment. *Id*. In particular, she may occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than 10 pounds. *Id*. She can stand and/or walk at least two hours in an 8-hour work day, and must periodically alternate between sitting and standing to relieve pain or discomfort. (R. at 82.) Ms. Hoyd is also limited in her ability to push and/or pull in her upper extremities. *Id*. In support of these findings, Dr. Litty states that Ms. Hoyd has myalgia, muscle spasms, status post neck surgery

7

with radicular pain, and low back pain with leg pain. *Id*. Dr. Litty also found that Ms. Hoyd can occasionally climb, kneel, crouch, crawl, and stoop, and she can frequently balance. *Id*. Ms. Hoyd is limited in her ability to reach in all directions (including overhead), but unlimited in terms of handling, fingering, and feeling. (R. at 83.) Dr. Litty also stated that Ms. Hoyd's condition is such that it is likely to produce "good days" and "bad days," and opined that she would likely be absent from work more than four days per month as a result of her impairments. (R. at 84.) Dr. Litty then wrote a statement concerning Ms. Hoyd: "Pt's multiple medical conditions keep her in chronic pain which not only affects her ability to work physically but also her mental abilities to concentrate, recall, etc." *Id*.

On March 13, 2008, Ms. Hoyd was seen by Dr. Litty and, on the related "Problem Note," Dr. Litty wrote fibromyalgia. (R. at 112.) On May 5, 2008, Ms. Hoyd complained of one to two days of intermittent left arm numbness and tingling with fluctuating pain in the left shoulder radiating down her arm and up into her neck. (R. at 112.) Her strength was 5/5 in all extremities with some breakaway weakness throughout, and she exhibited "sensation decrease in left hand." (R. at 113.) A head CT revealed right pterional dural calcification consistent with calcified hematoma versus calcified meningioma. (R. at 114.) Ms. Hoyd was also suffering severe headaches, which prompted a neck CT on May 6, 2008. (R. at 115.) No abnormality was identified. *Id*. A cervical MRI on that date showed prior anterior cervical discectomy and fusion C6-C7, degenerative osteophytes greatest at C3-C4, effacement of the anterior CSF space but no underlying cord signal change, and mild to moderate neural foraminal narrowing at C5-C6. (R. at 116.) A brain MRI showed small focus of atypical signal intensity in the right parietal dura consistent with dystrophic calcification or small meningioma. (R. at 117.)

On May 8, 2008, Ms. Hoyd was seen by a rheumatologist, Dr. Hardisty, for evaluation of generalized pain syndrome. *Id*. She had previously been referred to physical therapy by her primary care physician, with no relief. *Id*. She had multiple soft tissue tender points, though all joints had full range of motion. (R. at 118.) She also had normal strength and a normal gait. *Id*. The rheumatologist diagnosed her with fibromyalgia with secondary depression. *Id*. She was referred to physical therapy and encouraged to start water aerobics. *Id*. On June 3, 2008, an EMG was performed which had findings consistent with mild to moderate mononeuropathy at the left wrist (carpal tunnel syndrome). (R. at 121.)

### C. THE ADMINISTRATIVE HEARING

#### 1. <u>Ms. Hoyd's Testimony</u>

At the administrative hearing held on August 27, 2008, Ms. Hoyd testified that she stopped working on December 4, 2004, due to pain in her neck, back, and right hand. (R. at 432.) Ms. Hoyd testified that her neck pain entailed muscle spasms and "burning, stabbing pains" that occur daily. (R. at 434.) On this point, she rated her neck pain at a level eight out of ten. *Id*. To alleviate the pain, she takes Diazepam and Vicodin daily. (R. at 435.) She described her leg pain as "constant" and "digging" and rated it at a level nine or ten. (R. at 436, 438.) She testified that she uses a cane on a daily basis to walk. (R. at 437.) Ms. Hoyd testified that, besides the carpal tunnel, she feels "crawly, burning inside [her bones] and in [her] elbows," and she described her hands as weak (R. at 440). She testified that it is difficult to "get a skillet," "push the vacuum," or brush her hair. (R. at 440-41.) Ms. Hoyd estimated that she could lift up to three pounds, sit for fifteen to twenty minutes at a time, stand up for ten to fifteen minutes at a time, and walk roughly half a block. (R. at 441, 443-44.) Ms. Hoyd further testified that she performs household chores in short spurts and occasionally drives. (R. at 444-45.) Additionally,

Ms. Hoyd testified that given her pain, she is incapable of being a dependable employee (R. at 448).

    2.    **Medical Expert Testimony**

Board certified orthopedic surgeon Arthur Lorber, M.D. ("Dr. Lorber"), reviewed the medical evidence of record and testified at the hearing as an impartial medical expert. (R. at 448.) Dr. Lorber initially questioned Ms. Hoyd about her use of Vicodin, Diazepam, and Prozac. (R. at 449-50.) He confirmed that the record showed evidence of carpal tunnel syndrome on the left hand, degenerative disc disease of both the lumbar spine and the cervical spine, and a left knee impairment. (R. at 467.) He further noted that although a diabetes diagnosis was mentioned in the record, there was no support for this diagnosis. (R. at 455.) Moreover, he testified that diagnostic testing of Ms. Hoyd's knees was consistently normal, and that there was no examination showing the requisite trigger points to support the diagnosis of fibromyalgia. (R. at 459.) Dr. Lorber further opined that there was no objective evidence to support a finding that Ms. Hoyd had impairments that met or medically equaled the requirements of any listed impairment, but that there was support for a closed period of disability from December 2004 through mid-February 2006, due to Ms. Hoyd's back-to-back carpal tunnel and neck surgeries. (R. at 460-61.) Dr. Lorber opined that, after February 15, 2006, Ms. Hoyd could perform light exertion work, assuming the work did not require frequent or repetitive use of her left hand; did not require climbing, crawling, or balancing; and did not require working around vibrations or work hazards. (R. at 461-63.)

    3.    **Vocational Expert's Testimony**

Vocation expert Constance Brown ("the VE") also testified at the hearing. The VE testified that Ms. Hoyd could not perform her past work as she actually performed it. (R. at 467.)

The ALJ asked the VE whether she could identify any jobs that could be performed by an individual with Ms. Hoyd's age, education, and work experience who had the functional capacity set forth by Dr. Lorber in his testimony (light work requiring no climbing, crawling, or balancing; no work around vibrations or hazards; and no frequent or repetitive use of the left hand). (R. at 466-67.) The VE testified that such an individual could perform at least 22,000 jobs in Indiana, including jobs as a mail clerk, housekeeper, and arcade attendant. (R. at 469-70.) The VE then conceded that missing one day of work per week would not be acceptable for these positions. (R. at 472.)

## II. **DISABILITY AND STANDARD OF REVIEW**

To be eligible for SSI/DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, an ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. *See Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* Although a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

## III. DISCUSSION

### A. THE ALJ'S FINDINGS

The ALJ made the following findings as part of his decision. Ms. Hoyd met the special earnings requirement on her onset date (December 4, 2004) and continued to meet that requirement through the date of the decision. (R. at 41.) Ms. Hoyd has not performed substantial gainful activity since December 4, 2004. (R. at 42.) The medical evidence establishes that Ms. Hoyd has severe degenerative disk disease of the cervical and lumbar spine, status post anterior cervical diskectomy and fusion, carpal tunnel syndrome, status post carpal tunnel surgery, possible left anterior cruciate ligament and medial collateral ligament tear (but has not undergone any related treatment or surgery), and obesity. *Id*. However, Ms. Hoyd does not have an impairment or combination of impairments listed in or medically equal to one listed in the regulations. *Id*.

Next, the ALJ found that from December 4, 2004 through February 14, 2006, Ms. Hoyd did not have the residual functional capacity to perform even sedentary work. *Id*. Nonetheless, as of February 15, 2006, there was medical improvement in Ms. Hoyd's medical condition and medical impairment relating to her ability to work. *Id*. Therefore, by February 15, 2006, Ms. Hoyd had a residual functional capacity to occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk without restriction and without the aid of an assistive device; sit without restriction; and no frequent or repetitive use of the left hand. *Id*. However, Ms. Hoyd should avoid climbing ladders, ropes, or scaffolds; should avoid balancing and crawling; can frequently bend; and should avoid vibration and hazards such as heights and dangerous moving machinery. *Id.*

From there, the ALJ found that Ms. Hoyd's claim that her pain precludes her from working is not credible, as it is not supported by the objective medical evidence, the treatment notes and records of the treating physicians, or the reports from the consultative examiners. *Id*. The ALJ further found that Ms. Hoyd's daily activities are only mildly restricted; she only has mild difficulties maintaining social functioning; she only has mild difficulties maintaining concentration, persistence, or pace; and she has never experienced an episode of decompenstion. *Id.* In sum, although Ms. Hoyd cannot perform her past relevant work, she can still perform jobs that exist in significant numbers in the Indiana economy. (R. at 43.)

**B.     ARGUMENTS ON APPEAL**

Ms. Hoyd makes three arguments on appeal. First, the ALJ failed to articulate his application of SSR 96-7p when assessing Ms. Hoyd's symptoms. Second, the ALJ's decision erroneously analyzed Ms. Hoyd's fibromyalgia diagnosis. Third, the ALJ erroneously relied on unsound medical expert opinion and failed to rely on the treating physician rule. Each argument is addressed in turn.

**1.     <u>SSR 96-7p</u>**

When an ALJ makes a credibility ruling, he must adhere to SSR 96-7p, which pertains to evaluating symptoms and assessing an applicant's credibility and must complete a two-step inquiry. When evaluating symptoms (such as pain), the ALJ must first consider whether there is an underlying medically determinable impairment – i.e. "an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques" – that could reasonably be expected to produce the individual's symptoms. SSR 96-7p at *2. Second, if such an impairment exists, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine if the symptoms limit the individual's ability to complete basic work activities. *Id*. To

that end, the ALJ must often make a credibility determination based on the entire case record. When assessing an individual's credibility, the ALJ must consider the objective medical evidence and evidence such as:

> 1) The individual's daily activities; 2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . and 7) Any other factors concerning the individuals functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

SSR 96-7p further provides that "the reasons for credibility finding must be grounded in the evidence and articulated in the determination or the decision." *Id.* at *4. In addition, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at *1.

Here, the ALJ discussed the objective medical evidence at length as part of his SSR 96-7p analysis. From there, he explained why he discounted Dr. Litty's assessment and Ms. Hoyd's testimony regarding the severity of her symptoms. It is true that an ALJ cannot disbelieve an applicant's testimony regarding pain "solely because it seems in excess of the 'objective' medical testimony." *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006). However, here, the ALJ articulated numerous reasons for discounting Ms. Hoyd's complaints regarding the persistence and intensity of her pain. In addition to the objective medical evidence, the ALJ also

noted the absence of physical therapy notes in the record and the absence of follow-up and failure to schedule an appointment at the pain clinic. The ALJ noted that Ms. Hoyd reported only "intermittent pain which comes and goes which ranges from 3-4" on a scale of 0-10. Counsel argues that other reports of pain on a scale of 6-10 were ignored, however it is reasonable to assume that those reports are what the ALJ considered to be intermittent; as some were related to Ms. Hoyd's cervical polyps and not her back and knee pain. Additionally, the ALJ relied upon Ms. Hoyd's appearance and demeanor at the hearing (she "appeared to sit comfortably and testify without any overt indicia of any significant pain or any other problem").

Although the ALJ certainly could have explained his application of SSR 96-7p in a more clear and organized way, the Court is able to ascertain the ALJ's logic. In other words, the Court believes it can "trace the path" of the ALJ's reasoning. *Diaz*, 55 F.3d at 307. Along similar lines, even if the ALJ completed a more organized and comprehensible analysis of SSR 96-7p, the Court is convinced that it would still produce the same result. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result").

Finally, the Court pauses to note that 96-7p "governs the assessment of an applicant's *credibility*." *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007) (emphasis added). On this issue, the ALJ's determination is accorded considerable deference; his decision will be overturned only if it is "patently wrong." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *see also Schmidt*, 496 F.3d at 843 ("Because the ALJ is in the best position to observe witnesses, we will not disturb his credibility determination as long as they find some support in the record."). Here, the ALJ based his credibility determination on the medical evidence and his own visual perception of Ms. Hoyd during the hearing. Under similar circumstances, the Seventh Circuit has

found that credibility determinations should not be disturbed. *Adkins v. Astrue*, 226 Fed. Appx. 600, 606 (7th Cir. 2007) ("The ALJ based his determination on a combination of medical evidence . . . and the ALJ's own perception of Adkins as a witness. Because the ALJ's credibility finding is supported by the record, it should not be disturbed."). In the end, the Court simply cannot find that the ALJ's determination was so lacking in explanation or support that it is "patently wrong." Therefore, Ms. Hoyd's argument is rejected.

### 2. Fibromyalgia

Ms. Hoyd makes two sub-arguments relating to her fibromyalgia diagnosis. First, she suggests that the ALJ failed to properly consider that rheumatologist Dr. Hardisty diagnosed her with fibromyalgia. In his decision, the ALJ acknowledged Dr. Hardisty's diagnosis, but added that "Dr. Hardisty did not note the requisite number of trigger points for the diagnosis of fibromyalgia." (R. at 41.) According to Ms. Hoyd, Dr. Hardisty's failure to note the exact number of tender points is not particularly important, as certainly the doctor "is qualified to determine whether Ms. Hoyd had the requisite number of tender points to diagnose fibromyalgia." (Dkt. 16 at 22.) Ms. Hoyd devotes considerable attention to arguing that fibromyalgia can, in fact, be disabling. *See, e.g., Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working."). But, of course, a fibromyalgia diagnosis does not *automatically* entitle an applicant to benefits. In fact, most people who have fibromyalgia are not disabled from working. *Id*.

In any event, whatever the diagnosis, it "must provide sufficient evidence of actual disability." *Estok v. Apfel*, 152 F.3d 636, 638-39 (7th Cir. 1998) (fibromyalgia diagnosis alone is not probative evidence of disability where the physician gave no opinion regarding the severity of the condition or its impact on the individual's functional capacity). Here, Dr. Hardisty's

17

records indicate that Ms. Hoyd's laboratory work-up was normal, she had full range of motion in all joints, and she had normal muscle strength. (R. at 118.) There is nothing in the medical records to establish that the ALJ erroneously analyzed Ms. Hoyd's fibromyalgia diagnosis, and Ms. Hoyd bears the "burden of supplying adequate records and evidence." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). Therefore, the Court is not persuaded by this argument.

Second, Ms. Hoyd argues that the ALJ had a duty to re-contact Dr. Hardisty in order to clarify any confusion about the steps taken to reach the diagnosis. *See* C.F.R. § 404.1512(e). However, the regulations only require the ALJ to seek "additional evidence" if the evidence received is inadequate to allow the ALJ to reach a conclusion about whether the applicant is disabled. *See* 20 C.F.R. § 404.1527(c)(3) (providing that the ALJ "will try to obtain additional evidence" when "the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled"). Here, the ALJ was obviously capable of discerning whether Ms. Hoyd had been diagnosed with fibromyalgia. Thus, the Court is not persuaded that the ALJ had reason to think evidence was missing, that there was a gap in the record, or that there was any real ambiguity in the diagnoses. For this reason, the Court is not persuaded by Ms. Hoyd's fibromyalgia-related arguments.

### 3. **Expert Opinions versus Treating Physicians**

Ms. Hoyd's final argument is that the ALJ erred by relying on the testimony of Dr. Lorber, the medical expert who testified at the hearing. Instead, Ms. Hoyd argues, the ALJ should have relied on the opinion of her treating physician, Dr. Litty. On this point, the regulations provide as follows: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). Further, when an ALJ decides to reject a treating source's opinion, "good reasons" must be given. *Id*. That said, the Seventh Circuit has readily acknowledged that "a treating physician's opinion can be a mixed bag." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). Indeed, courts "must keep in mind the biases of a treating physician may bring to the disability evaluation.... The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (citation and internal quotations omitted); *see also Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) ("many physicians ... will bend over backwards to assist a patient in obtaining benefits.... Moreover, ... the treating physician is often not a specialist in the patient's ailments, as the other physicians who give evidence in disability cases usually are").

Here, the Court is persuaded that, under the circumstances, the ALJ did not err by giving little weight to Dr. Litty's assessment that Ms. Hoyd could lift no more than ten pounds, periodically needed to alternate between sitting and standing, and would likely miss more than four days of work per month as a result of her impairments. The ALJ reasonably determined that those limitations were not well-supported by the record and were inconsistent with the opinions of at least three other physicians. As the ALJ noted, "[t]here is minimal objective evidence of record to corroborate or support Dr. Litty's assessment of the claimant's residual functional capacity." (R. at 38.) And, as the Seventh Circuit has noted, "once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight." *Hofslien*, 439 F.3d at 376. Accordingly, the Court is not persuaded by Ms. Hoyd's final argument.

19

# IV. CONCLUSION

For the reasons stated herein, the decision of the Commissioner of Social Security in this case is **AFFIRMED**.  A separate judgment will accompany this entry.

SO ORDERED.   02/29/2012

 _____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov